I have 1585 Grussmark against GlaxoSmithKline. Let me give everybody a moment to get laid out and settled. I have the Grussmark against GlaxoSmithKline. The issue before the court today is not whether the GSK device that we've accused of infringement infringes or not. The issue the court has to decide is whether Dr. Grussmark was denied his day to have that issue determined by a jury. Summary judgment was granted against him based on what we submit were erroneous conclusions by the district court on both prongs of the infringement analysis. First, claim construction, and second, even given the claim construction by the district court, which we contend was erroneous, on the second prong of the analysis, the factual determination of whether the accused device falls within the scope of the claim. Now there's no dispute here at all that the language of the asserted claim to Dr. Grussmark's patent includes no limitation that the stand-up toothpaste container will retain its shape after discharging any portion of its contents. That's just not there. Accordingly, the question is whether the district court was justified in disregarding the plain meaning of the claims in favor of reading into the claim, and that's precisely what the district court did, reading into the claim, absent an amendment, language that appears only in certain arguments that were advanced by Dr. Grussmark during the course of prosecution, arguments that admittedly were made in the context that distinguishes his invention of the prior art, but were not made to specifically define claim language. See if I understand the breadth of the argument you're making. Are you suggesting that a statement made to disclaim some category of prior art does not serve to limit the scope of the claim? Not at all, Your Honor. Okay, I wanted to make sure. In appropriate circumstances, if the disclaimer is clear and unmistakable, as this court has stated on numerous occasions, then of course it will limit. Okay, I thought you were making a broader argument. No, Your Honor, I'm not. In the context of this case, however, let's look first of all at the structure of the claim. The claim begins by defining the stand-up toothpaste container as flexible. The claim recites that as toothpaste is discharged from squeezing, toothpaste will be discharged. It says nothing about springing back to its original shape, certainly not springing back and fully retaining its shape. The claim goes on to describe the cap and its dimensions. And then there's linking language that ties together the tube and the container cap. And then it explains the stand-up function of the tube based on the geometry of the dispenser and the cap, not based on the characteristics of the tube itself, not because it's plastic, not because it fully springs back, retains its shape. Even the district court, Your Honor, did not suggest that the claim should be limited to a tube which fully retains its shape. All the district court added to the claims was a limitation which it teased out of the claim that it retained its shape after discharging its contents. The court was unwilling to read in the limitation that the tube be all plastic, but certainly the embodiment that was shown to the examiner during the interview was an all-plastic tube, which was, again, just an example of Dr. Grossmark's invention. So we contend that while certainly there is disclaimer-type language, it is anything but clear and unmistakable as to the universe of products that have been excluded. Certainly it did not exclude every single product that would retain its shape unless it's enough to preclude the function of standing up. What about the argument that was made to overcome the Chari patent? Chari or Cari? Chari, Your Honor, yes. That's precisely what we're referring to. That specifically states that Claim 21 has been amended to further define over Chari by limiting the combination, so on and so forth. However, a stand-up toothpaste container having container walls made of plastic has illustrated at the interview will retain its shape even after discharging any parts of the contents. That's the language that we've been focusing on, Your Honor. So why isn't that limiting language? That, if it limits anything, it limits it to avoiding a Chari-type container, which as shown in our brief, we have a picture of the Chari device, which is the old-fashioned, old metal tube that doesn't retain its shape at all. Chari, in contrast, for example, to the GSK tube, which is accused, was never designed, nor has there been any indication by the District Court or GSK, that the Chari tube would stand up. Now, we know, for example— Does it have to retain its shape completely or just partially or otherwise? We contend, Your Honor, that it needs to retain its shape enough to accomplish the inventive purpose. That's the language of the voucher loan case that we rely on. The District Court seems to have been concluding that in Step 2 of the analysis, even if there is some limitation on the claim, by excluding the accused container, the District Court, we contend, erroneously denied Dr. Grossmark his day in court to have a jury decide whether the GSK-accused device retains it enough to accomplish the stand-up function. Now, if you look at pages 6 through 8 of our brief, we quote extensive testimony from every single GSK witness. Every one of them agreed that the container, the GSK container, was designed, intended to, and functioned to stand up. The project was called the Eiffel Project because it was like an Eiffel Tower. Under those circumstances, where every witness said exactly what it was intended to do, it's clear that it's not Chari, and even the District Court agreed. The District Court, while characterizing at one point in its opinion the Chari container as a dead fault, suggesting that maybe it's like Chari, in the very next breath, in the very next breath, acknowledged the testimony of the designer, Mr. Hadke, that it does tend to spring back, and it does retain its shape enough to accomplish the function. That was an issue that a jury should be entitled to determine. So, even the District Court didn't limit Dr. Grussmark to an all-plastic container. GSK asked it to. It didn't do so. No one's really questioning that on appeal. GSK hasn't cross-appealed and suggested to the court that you should read the plastic, the all-plastic limitation in. So it's clear that at a minimum, Dr. Grussmark is entitled to at least, if not literal, an opportunity to prove literal infringement, at least infringement under the doctrine of equivalence here. The Chari container, again, is a different animal. It's a different type of container. It was never intended to stand up. No one has suggested that it will stand up. We can't tell anything from the dimensions in the Chari patent itself. This Court has noted time and time again that you cannot take from a patent drawing anything too specific about its dimensions unless they're explicitly noted in the patent. Chari certainly does not note anything of the sort. But wouldn't any flat-headed tube stand up for the most part? No, absolutely not, Your Honor. Why not? And if it would, if it would, that again, that's a fact question, is it within the scope of the invention? It's got to be flexible. It's got to be squeezable. And it has to be dimensioned according to the claim. Does it have to retain its shape? It has to retain its shape enough that it will continue to stand up. Now, I have with me, Your Honor, and I very rarely do this at a Court of Appeals argument, and I've been in many, I happen to have a full tube, and I have a tube where the contents have been discharged. And you can see that even when it's flattened out, even when it's flattened out, this tube, if it's flattened out, that's the easy spot. Is that an exhibit from? These were both shown to the district court, or identical persons. That's the accused product, or which? This is the accused product. Both of them. Now, I assume Mr. Sipes has seen these. Mr. Sipes has his own. Well, that's fine, then. We don't, no prejudice. That's the full one. That's the full one. Right. Stands up. That's one. Now, can I bend it over and make it fall over? Sure. Yeah. But in actual practice, they designed it to do that. The shower container's not going to do that. I don't know. I have one. I have to say, since we're dealing with anecdotal evidence of a sort here, I tried this morning with my little tiny cap tube of definitely a foil. And if I position the foil right, I could make it stand on its own. If you have good balance, Your Honor. We can also have jugglers come in and balance things on their nose, Your Honor, but I don't think that's what the case is about. The case is about what did Dr. Grossmark invent, what should his claims be construed to cover, and what did GSK do? But as you demonstrated with the demonstration you just made, that tube will not always stand on its head. If you bend the bottom of the tube over, it'll fall over. You can make it fall over. Right. I agree, Your Honor. So it's not something which will naturally stand on its head under all ordinary circumstances. You have to do something, which is to, say, straighten out the top of the tube. Well, if you discharge the contents as they're intended to be discharged with that type of, and again, that's a coated student. It's got a plastic layer in there, which is what causes it to do that. It will stand up. And again, we don't have to demonstrate that it does it all the time. Let's look at the claim. The claim never says it does it all the time, invariably. The claim, even as the district court construed it, didn't say fully retains its shape after discharging its contents. It says retains its shape. These are fundamentally questions that a jury should get to decide. I see that I'm into my rebuttal time. Just one quick question. Sure, Your Honor. A stand-up could cover any product which is capable of standing up or a type of product which is designed to stand up, right? Arguably so, Your Honor, but again, we have other claim language here which defines the geometry of the tube. For example, we don't contend that the pump-type container, which is rigid and is not flexible, which, of course, would stand up, is within the scope of this invention. It has to still have the other dimensional requirements of the claim. The term stand-up doesn't appear in a vacuum in this claim. It is within the context, the overall context of the invention and what Dr. Grussmark invented and intended to cover. Notably, even though the language was readily available during prosecution, if the examiner had said, Dr. Grussmark, in order to get your claim allowed, if you will amend the claim to state, and the language was right there, he was never asked to do that. The district court erred in requiring something which just wasn't there and at a minimum going overboard in how much it added to the claim, then precluding Dr. Grussmark from getting to the jury with the second part of the analysis. Why don't we hear from the appellees and we'll save the remainder of your rebuttal time. Mr. Seitz. May it please the court. My name is Christopher Seitz. I'm here on behalf of GlaxoSmithKline, the defendant. Let me begin by saying that as counsel, Mr. Metlick, admitted, there is disclaimer-type language in the prosecution history. The inquiry is whether or not a member of the public, such as GlaxoSmithKline, can rely on that language, and the law is clear that it can. The purpose of the public notice function is to allow the public to avoid the claims where a clear statement of limitation is imposed. To begin, Mr. Metlick suggested that the language does not appear in the claim. Each of the claims begins not with a flexible tooth, but with the requirement that the device be a combination of a dental floss dispenser and a stand-up, squeezable toothpaste container. The issue in this case is the meaning of the word stand-up toothpaste container. That is the claim limitation we rely upon. That claim language was the claim language that the applicant used to distinguish the prior art. And as this court has repeatedly made clear, for example, in the Springs Window case, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover. He is, by implication, surrendering such protection. A member of the public can look at the way in which an applicant relies on his claim language to distinguish the prior art to understand the extent of that claim language. The claim goes that far and no farther. In this case, in his October 1995 response to an anticipation rejection based on the Cherry patent, Dr. Grossmark made clear what stand-up meant. This is at page A202 of the joint appendix. First he said, the examiner member had rejected the patent, that claim, Claim 21, as anticipated over Cherry. That is, the examiner understood the Cherry container to be a stand-up container and said exactly that in his remarks. In response, Dr. Grossmark argued, the squeezable container illustrated in Figure 5 of Cherry is not a stand-up squeezable toothpaste container. That is, he was arguing that Cherry doesn't disclose a stand-up container. Well, he notes that Cherry can be rolled up and therefore will become unstable and fall over. He then says, however, a stand-up toothpaste container, that's the language of the claim, a stand-up toothpaste container having container walls made of plastic, as illustrated in the interview, will retain its shape even after discharging any part of the contents of the container, thereby always defining a container structure that will allow the combination container dispenser to stand up squarely on a planar surface. Do you think that that's limited then to plastic containers? I believe that contains three limitations. That the container be plastic, that it retain its shape after discharging any portion of its contents, that is, that it bounces back to its original shape, and that it always define a container structure that will allow the combination container dispenser to stand squarely on a planar surface. Those are the three elements of a stand-up tube that the argument that was argued to the PTO to distinguish the stand-up container from the Cherry container. And all of that language, those three requirements, are therefore the definition, the binding definition of stand-up container. But you're not saying that only plastic would be available? What if they used a malleable type of rubber or a plastic that's... What is interesting is that actually raises the point. As to literal infringement, I believe that he would be limited to the all-plastic tube. There is additional evidence in the patent that would support that as well. The specification defines the new stand-up container as a container having walls of plastic. The evidence in the record, the testimony in the record, which is undisputed, is that at the time of filing in 93-94, the new tube was the all-plastic co-extruded tube. The foil laminate tube, the kind of tube that we use, like this, that flattens was the standard tube at the time, the pre-existing tube. I'm not aware of any testimony that a rubber tube was even foreseeable. If we were into the Festo domain of possibly rebutting an estoppel under the Doctrine of Equivalence, it may well be that a rubber tube might not be surrendered. There's a lot of questions there. We don't know if the opportunity to rebut from Festo applies to argument estoppel. As far as I'm aware, this Court has not addressed that question. But what we do know is two things. What was surrendered were tubes that collapse, that stay flat upon discharging its contents, that don't always define a structure that stands upright. Those were clearly and plainly surrendered. That puts them outside the claims for purposes of literal infringement, and it stops the patentee from asserting equivalence because this Court has also made clear, in cases such as Desper, that once the disclaimer surrenders subject matter through argument, they are stopped from then recapturing it. And therefore, there is an estoppel that prevents recapture of containers that do not retain their shape upon discharging content, that do not always define a structure that stands upright. Mr. Sykes, what does the record show with respect to the components of the accused tube as distinct from the components of the old traditional tube like the one on my shelf? Well, the old traditional tube depends, I suppose, on the age. Maybe there are many of those, perhaps. The one that's on your shelf now is probably a foil laminate tube. If you look at page A273, this is the deposition of Sabol.  He was asked, this is beginning on page 190 of the transcript of A273, what was the standard toothpaste containers in 1993-94 timeframe. He said, what was new to the dentifrice market at that time was using all plastic co-extruded tubes instead of laminate tubes to make the toothpaste tubes. And why was that new? To my knowledge, no major dentifrice customer or manufacturer had put their toothpaste in a co-extruded tube. They've typically either been in laminate or prior to that, metal. So if you go back far enough, you find the standard tube was a foil laminate tube. But by the time that we're talking about here, the standard tube was the foil laminate tube. This tube. When you say foil laminate, that is foil laminated on plastic.  Now, what this also shows is that, as I said, there are three limits, plastic, retained shape, and always defined structure. The understanding of plastic at the time would have been all plastic because remember the plastic tube was being contrasted to the standard tube. If you look at the patent, for example, in the first column of the patent, column one, beginning at line 30, it concedes that the combination of a dental floss dispenser to a standard toothpaste container was known and distinguishes the new stand-up container. Now I'm reading from line 36. This new stand-up container is significantly different from other containers because it's made from flexible plastic material. Given that at the time the standard container was foil laminate, that is a foil and plastic layer, and here it's saying the new one is plastic, one in the art would understand that as all plastic. But we don't need to go there because, even independent of the plastic limitation, the additional requirements in disclaiming in the argument against Cherry, that is that it retain its shape after discharging its content, that it always define a structure that stands upright, those alone are sufficient to distinguish the tube that is used in the accused product. So we have actually three different bases, three different elements to the definition of the stand-up toothpaste container that the applicant himself used to distinguish prior on the prosecution. To use Mr. Metlock's phrase, the disclaimer type language that was used. All three of those elements, plastic, retain shape, and always defines a structure. All three of those individually suffice to render the claim not infringed either literally or under the doctrine of equivalence. I'm not sure I understood. What happens if it's only a partial discharge of the tube itself? Because it doesn't say it has to stand up when all of the contents are extruded, but only a part. So if it's only a half... This is a partially discharged tube. Well, you squeeze it in the middle. It also remains flat. Squeeze it from the end like my wife wants me to do. If you do it this way, I can squeeze it, no question, so I can keep it standing. I can do that, or I can bend it and it will fall. The testimony in the record, by the way, this is the testimony of Mr. Whelan under deposition, is that as you use it, it becomes very difficult to stand up. The tube is bendable, so as people use the product, it becomes difficult to stand up, and that's at A371. I think the truth is those who are extremely careful and desire to keep it standing up may be able to keep it standing up. But the truth is I think the typical user, it's not going to remain standing, and the truth is it's certainly not always going to define a container structure that stands upright. And it is indisputable, either Mr. Mentlich's use to or mine, that it does not, under any circumstances, retain its shape following use. It stays flat and remains flat. That, too, is the testimony in the record. It's what's called a deadfold product. That's at A268. Again, say about deposition, what the district court found was undisputed is it's a deadfold product that remains flat after discharge. Now, as I mentioned, in addition to literal... Now, when you say the district court found that, that sounds like language of not language of summary judgment. Well, no, because there were... Dr. Cressmark, of course, is the plaintiff, bears the burden of proof. What the court found is that he had not adduced... He had not adduced enough evidence to get to the jury with respect to the contrary conclusion. Correct. And that's... He discusses... If you look at A5, he discusses Dr. Grussman's failure to dispute our proposed undisputed facts, paragraphs 12 and 14, and then reiterates what they were at A9. So he found those facts undisputed. Now, as I indicated, one ground on doctrinal equivalence is pure argument estoppel. As this court made clear in Desper and in Gentry products, when one surrenders subject matter through disclaimer-type language, that forecloses not just literal but doctrinal equivalence. And that makes sense. The public relies on arguments distinguishing prior to know how far the claims go. That is where the safe conduct begins, safe from literal infringement, safe from equivalence infringement. Separate and apart from estoppel, and estoppel suffices here to foreclose doctrinal equivalence, is the doctrine of specific exclusion. The argument distinguishing Sharry was particularly absolute. Always defines a container structure that stands upright. That's the language that was used. Always is a very absolute term. This clearly falls down often. It is the antithesis of always defining a product that stands upright. Similarly, remains, retains its shape. This is a deadfold product. The testimony in the record shows that a deadfold product is seen in the arts as the opposite of a resilient product. It is a deadfold product when it remains flat. It has some advantages. You can tell how much you've used. This tube is half full. This is empty. That's an advantage of a deadfold. A resilient tube that springs back, the advantage is it always retains its shape. It's always the same shape. The downside is you can't tell how much you've used. There are advantages to each. I think in the record there's a testimony, again, that it's kids' tubes that tend to be the springback tubes because that sucks any excess toothpaste back into the tube. That's helpful for kids who don't tend to be as careful in discharging toothpaste. Many people like to know how much, so they use the deadfold. The point is deadfold and springback tubes are opposites. To limit yourself to a springback tube, to a tube that retains its shape, is to exclude a deadfold. So even aside from the estoppel argument, we have specific exclusion. Either one precludes, as a matter of law, assertion of doctrinal equivalency. But you could surely have something, indeed, that's one of the questions floating through this case, is something in between the two. It's not as if it either has to be black or white. It can be gray. I'm not aware of any tube that partially springs back. But you could surely have one that is less resilient but still has some resiliency to it. I won't foreclose the possibility, and there may be an opportunity. Your product is not one of them. The undisputed evidence is that it is a deadfold product that remains flat after squeezing. Visual inspection makes that clear. Ours is clearly the opposite of what was disclaimed. Again, under Festo, Dr. Zorn has not attempted to rebut Festo. There may be a type of tube for which it could be argued that is so, whether it was not foreseeable or just is so outside the nature of the argument as to not be excluded. That is not this case. This case, what the accused product is, is the standard foil laminate tube, the standard deadfold tube. That was clearly disclaimed in the argument. The question, remember, is not are we identical to the Chari tube. The Chari tube exists as a picture in a pack. We'll never know. Maybe that was a foil laminate tube. The tightness of the roll suggests it might be a metal tube. But what is true is we are not the product that meets the requirements of the claims as they were defined by the applicant to distinguish prior art. The argument to distinguish Chari was absolute, and we are the antithesis of that product. And I would note, as you know, that that argument was repeated subsequently in his brief on appeal to the Board of Appeals in the Patent Office. The argument was repeated, so twice he distinguished the prior art that way. Your time has expired. Let me ask you one other question that I don't want to force you into a demonstration. Does the empty tube in your product roll up? It rolls up, but not tightly, and it will start to unroll. Well, the thing about a laminate tube as opposed to a metal tube, of course, is that it is thicker. And so when it rolls up, it starts to unroll. Okay. That's fine. Thank you. Thank you, Your Honor. Thank you, Mr. Sipes. Mr. Medlik, you've got three minutes, a little over three minutes. Let me begin where Your Honor's question just left off, because that is a finding that, in fact, the judge made. After finding that the GSK tube was a deadfold, which is a word, Your Honor, he then found the tube can be rolled up, but it will not stay entirely rolled due to the effect of the plastic layer in the tube, and that is found at page 89 of the appendix. Your Honor, what I believe Mr. Sipes' argument has demonstrated is that, at a minimum, there are numerous fact issues that a jury is entitled to decide in this case. There is a gray area. Shari is what, if anything, was disclaimed. Shari is what the public has a right to rely on, if anything, from the prosecution history. You want to make a Shari-type container with a cap that has floss in it, and maybe will stand up some of the time. We don't even know if Shari would. There's no proof in the record one way or the other on that, and no one has suggested that it would. Go ahead and do it. But, in fact, the question is, has GSK done something that is indeed in the gray area? We know, again, it was designed to stand up. Then again, what does it mean to retain its shape? If it's flattened out and does indeed, that's basically the shape it had. It's not 100 percent. It's not a rigid container. It's not fully the way this is. And, sure, you can manipulate it to roll it up. But, again, as Your Honor observed and as the Court found, it will spring back, and, therefore, it is not a pure dead fold. These are all fact issues. We maintain that even given the strictest disclaimer language, a jury ought to get to decide whether the GSK device falls within the scope of the claim as construed. But, once again, there's nothing in the claim itself that limits it. As far as a FESTO presumption, there is none here. The District Court never said a word about FESTO. It's pure argument, as Your Honor actually discussed during an earlier argument this morning. There is no law that we're aware of that extends FESTO to pure argument-based estoppel. And as to the effort now, and I think I hear Mr. Sipes to be now suggesting that even though they didn't try to argue in their brief, they are now suggesting that the District Court committed error by not reading the all-plastic limitation to the claim. Well, that's clearly not there. The District Court never said it was, and all the reasons why the District Court wouldn't read plastic into the claim are reasons why this Court should not go as far as GSK would have you go, which is to read a fully, fully springback structure. Does it retain its shape? Enough to accomplish the purposes of the inventor. Clearly, this does. Does that again? The Barnes and Noble case, where there's a question of whether the ridge was absolute, whether it was absolutely smooth as opposed to smooth, even under the District Court's view. It doesn't have to fully retain its shape. It's enough to stand it up. That is what GSK intended. At a minimum, Your Honor, we request that Dr. Gross-Marquette is dated in court to have a jury decide these issues. Thank you. Very well. Thank you, Mr. Matlock and Mr. Sipes. The case is submitted. Now the Court is adjourned until tomorrow morning at 8 a.m.